UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

DIVERSATEK, INCORPORATED,

> Plaintiff,

> v.                                          Case No. 07-C-1036

QBE INSURANCE CORPORATION,
SLG BENEFITS AND INSURANCE LLC,

> Defendants.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (DOC. # 23) AND GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT(DOC. # 25)

Plaintiff, Diversatek, Inc., brought this insurance coverage action against

defendants, Auxiant, QBE Insurance Corporation and SLG Benefits and Insurance LLC,

alleging breach of fiduciary duty, breach of contract and bad faith denial of its claims for

reimbursement made under an Excess Loss Insurance Policy (Policy) issued by QBE.[1]

Both sides seek summary judgment.

Diversatek asserts that it is entitled to summary judgment because its

employee's medical claims were covered by the Plan when it paid reimbursable medical

bills. In addition, Diversatek argues that it is entitled to 12% interest per year on the

damages pursuant to Wis. Stat. § 628.46(1) and attorneys' fees under Wisconsin's rules

concerning an insurer's bad faith denial of coverage.  Diversatek maintains that SLG's

conduct amounted to tortious bad faith and that SLG should be held jointly and severally

liable for the damages.

---

[1] Auxiant was dismissed as a defendant by this court's May 9, 2008, Order.  Doc. # 14.

QBE contends that Diversatek was not required to pay medical expenses under the Plan and that because the validity of the claims is debatable Diversatek is not entitled to interest or attorneys' fees and denial of the claims was reasonable. Finally, QBE asserts that because SLG is its agent and not a party to the Policy, it can have no liability on the Policy and is entitled to dismissal on the cross motion for summary judgment. For the reasons set forth below, Diversatek's motion will be granted in part and denied in part and QBE and SLG's motion will be granted in part and denied in part.

## FINDINGS OF FACT[2]

Diversatek is a holding company consisting of small to medium sized manufacturing businesses; QBE is a general insurance provider offering, inter alia, health-related insurance products; and SLG is a medical stop-loss insurance program management company. (Stip., ¶¶ 1-3.) Diversatek provides health insurance to its (and its subsidiaries') full-time exempt employees under a self-funded Employee Health Care Plan (Plan) and is the named fiduciary and Plan administrator. (Stip., ¶ 4.) Auxiant serves as the Plan's third-party administrator with administrative responsibilities that include, reviewing applications for Plan eligibility; processing claims; answering employee inquiries about the Plan; and, submitting claims in excess of the stop-loss reimbursement limit to QBE and SLG. (Stip., ¶¶ 5-6.) Diversatek purchased an excess loss, or "stop loss," insurance policy from QBE through its agent, SLG, effective June 1, 2006 – May 31, 2007, which provided reimbursement to Diversatek for certain claims covered and paid by the

---

[2] These facts have been derived from the Stipulation of the Parties. Doc. # 28.

Plan in excess of $35,000 per Covered Person, up to a maximum reimbursement of $965,000 per Covered Person. (Stip., ¶ 7.)

Robert White, a former Diversatek employee, was shot and seriously injured on July 8, 2006. (Stip., ¶ 8.) At the time of the shooting, White was a full-time, active employee of a wholly-owned Diversatek subsidiary starting in 2001 and as such, was eligible for Diversatek employee benefits, including health coverage under the Plan. (Stip., ¶ 9.) After the shooting, White required inpatient hospitalization. (Stip., ¶ 10.) On July 10, 2006, as a consequence of his inability to work, Diversatek placed White on an unpaid medical leave of absence, even though Diversatek had no written policies or procedures regarding employee leaves of absence. (Stip., ¶¶ 10-11, 14.)

In early October 2006, Auxiant received the first in a series of medical providers' bills relating to White's hospitalization and treatment and requested that Diversatek complete a "work status" form for White, as his medical expenses exceeded the Specific Attachment Point of $35,000 per employee under the Policy. (Stip., ¶ 15.) The work status form is used to verify employee eligibility for coverage under the Plan and to provide information to the stop loss carrier in connection with healthcare claims. (*Id.*)

Later in October, Auxiant, on behalf of Diversatek, filed an initial $59,451.34 claim under the Policy with SLG relating to payment of White's medical bills. (Stip., ¶ 16.) On October 29, 2006, SLG emailed Auxiant requesting completion of a work status form with information regarding White's last date actively working, the continuation of his coverage and informing Auxiant that this claim would be held pending receipt of the information. (Stip., ¶ 17.)

-3-

On November 13, 2006, Auxiant again requested the work status form for White from Diversatek and that same day, Diversatek's Controller, John Feistel, completed the work status form, indicating White's status as not actively working, and "Other (Explain): on Leave of absence." (Stip., ¶¶ 18-19.) Auxiant received the form the next day. (Stip., ¶ 19.) Auxiant emailed Feistel on November 29, 2006, acknowledged receipt of the form, and requested additional information, including the date White was last actively at work, the date his leave of absence began, and when he was expected to return to work. (Stip., ¶ 20.)

In early December, Auxiant filed an additional claim with SLG relating to a $350,915.75 hospital bill for White. (Stip., ¶ 21.) On December 4, 2006, SLG notified Auxiant that it could not proceed with review of this claim until the previously requested information was received and the same day, Auxiant informed Diversatek that QBE and SLG would not advance fund Diversatek's claims based on the information it provided about White on the work status form. (Stip., ¶ 22.) Auxiant indicated that Diversatek needed to supplement the work status form with information regarding the last date White actively worked 40 hours per week, as required by the Plan; how White's benefits coverage continued while he was on leave of absence; and the dates that the continuation of benefits were applied. (*Id.*)

White's hospital bill qualified for a $66,841.10 provider discount if paid in full by December 12, 2006, and Auxiant informed Diversatek that December 4, 2006, was the last date for it to supplement White's work status to receive advance funds from QBE and SLG in time to qualify for the provider discount. (Stip., ¶ 23.) Otherwise, according to Auxiant, Diversatek had to pay the bill out-of-pocket prior to December 12, 2006, to qualify

-4-

for the discount and then submit a reimbursement claim for the monies paid to QBE and SLG. (*Id.*) Diversatek's Vice-President, Julie Skowronski, notified Auxiant by email later that day that White's last full work day was July 7, 2006, and that his "current status" was "Leave of absence." (Stip., ¶ 24.)

On December 12, 2006, Diversatek paid White's hospital bill out-of-pocket and qualified for the provider discount. (Stip., ¶ 25.) The same day, Auxiant, on behalf of Diversatek, made timely claims to SLG/QBE for White's medical expenses under the stop loss policy which, after deducting the $35,000 specific attachment point, totaled $419,308.60 and QBE and SLG denied the reimbursement claims. (Stip., ¶¶ 26-27.)

White never returned to work at Diversatek following his hospitalization and stopped receiving pay from Diversatek on June 8, 2006. (Stip., ¶ 28-29.) Diversatek terminated White on March 30, 2007, and offered him COBRA coverage, which he declined. (Stip., ¶ 30.)

## GOVERNING LAW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "Material facts" are those that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion

for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 470 (7th Cir.2007). On cross motions, the court construes "all facts and inferences therefrom 'in favor of the party against whom the motion under consideration is made.'" *In re United Air Lines Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)).

The Plan at issue is governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. Although an ERISA governed plan provides the background for this case, ERISA preemption does not apply because this case is a simple breach of contract dispute between an insured (Diversatek) and an excess loss insurer (QBE) over whether coverage exists under an excess loss policy for claims paid by Diversatek. *Computer Aided Design Sys., Inc., v. Safeco Life Ins. Co.*, 235 F.Supp.2d 1052, 1057 (S.D. Iowa Nov. 21, 2002). The plaintiff relies on diversity jurisdiction to bring the action in this court. Joint Notice of Removal, p. 2.

"[T]he construction of language in an insurance policy, according to Wisconsin law... is a question of law, appropriately disposed of on a summary judgment motion. *Burgess v. J.C. Penney Life Ins. Co.*, 167 F.3d 1137, 1139 (7th Cir. 1999) (citations omitted). "Construction involves an issue of fact only in 'case of ambiguity where words or terms are to be construed by extrinsic evidence...'." *Continental Corp. v. Aetna Cas. & Sur. Co.*, 892 F.2d 540, 543 (7th Cir. 1989) (citation omitted).

Generally, under Wisconsin law, the interpretation of insurance contracts is governed by the rules of construction applicable to other contracts. *Burgess*, 167 F.3d at 1140; *Fernandez v. Strand et. al*, 63 F.Supp.2d 949, 953 (E.D. Wis. Aug. 20, 1999)

(citations omitted).  Courts should interpret insurance contracts in a way that gives effects to the true intent of the parties and the extent of the policy coverage.  *Fernandez*, 63 F.Supp.2d at 953; *see also Continental Corp.*, 892 F.2d at 544 and *United American Ins. Co. v. Wibracht*, 825 F.2d 1196, 1199 (7th Cir. 1987) (citations omitted).  When construing clear and unambiguous policy language, such language is to be given the plain and ordinary meaning as understood by a reasonable person in the insured's position.  *Burgess*, 167 F.3d at 1140; *Continental Corp.*, 892 F.2d at 543-44; *Wibracht*, 825 F.2d at 1199; *Fernandez*, 63 F.Supp.2d at 953 (citations omitted).  Courts should avoid rewriting by construction, as it binds an insurer to risks the parties did not contemplate and for which premiums were not paid.  *Continental Corp.*, 892 F.2d at 544; *Fernandez,* 63 F.Supp.2d at 953 (citations omitted).

Any ambiguity as to the meaning of a contract term must be resolved in the insured's favor.  *Continental Corp.*, 892 F.2d at 543 (discussing exclusions specifically); *Fernandez*, 63 F.Supp.2d at 953 (citations omitted).  An ambiguity exists if a contract term is reasonably or fairly susceptible to more than one construction. *Continental Corp.*, 892 F.2d at 544; *Wibracht*, 825 F.2d at 1199; *Fernandez*, 63 F.Supp.2d at 953 (citations omitted).  Whether a contract term is ambiguous is a question of law.  *Wibracht*, 825 F.2d at 1199; *Fernandez*, 63 F.Supp.2d at 953 (citations omitted).  And, if no ambiguity exist, courts will not engage in construction of the contract terms, but only apply them. *Burgess*, 167 F.3d at 1140; *Continental Corp.*, 892 F.2d at 544; *Wibracht*, 825 F.2d at 1199 (citations omitted).

In a coverage dispute governed by Wisconsin law, the insured has the burden of proving that coverage applies.  *Fernandez,* 63 F.Supp.2d at 953 (citations

omitted). However, if relying on a policy exclusion, the insurer has the burden of proving that the exclusion is applicable and the clause is construed strictly against the insurer. *Fernandez,* 63 F.Supp.2d at 953 ; *Burgess,* 167 F.3d at 1140 (citations omitted).

## DISCUSSION

### The Policy and Plan

Because the Plan and Policy are central to determining whether summary judgment may be granted, the court consults these documents at the outset. The language relevant to the instant dispute reads:

**SECTION II**
**SPECIFIC EXCESS LOSS COVERAGE**

WE [QBE] will reimburse YOU [Diversatek] for Plan Benefits Paid in excess of the Specific Attachment Point, not to exceed the Specific Lifetime Maximum amount shown in the Schedule. WE will reimburse YOU after YOU have provided an acceptable proof of loss and satisfactory proof of Paid Plan Benefits.

Stip. of the Parties, Ex. C, p. 6.

**SECTION I**
**DEFINITIONS**

Plan Benefits means that the health benefits covered by the Plan during the Policy Period which are:
1.     Incurred on or after the Effective Date of this Policy;
. . .
Plan benefits do not include:
. . .
3.  expenses that are not covered by the Plan or this Policy...

Paid means that a claim has been adjudicated by the TPA [Third Party Administrator] and the funds are actually disbursed by the Plan prior to the end of the Benefit Period. Payment of a claim is the unconditional and direct payment of a claim to a Covered Person or their health care provider(s). ...

-8-

Stip. of the Parties, Ex. C, pp. 3-4.

**SECTION VI**

**EXCLUSIONS**

WE will not reimburse YOU for any loss or expense caused by or resulting from:

[1.] expenses incurred while the Plan is not in force with respect to the Covered Person, or for a person not covered under the Plan;

. . .

[17.] Payments YOU make under YOUR Plan for services and supplies which are not included in YOUR Plan or which are outside the requirements of YOUR Plan Document or this Policy...

Stip. of the Parties, Ex. C, pp.8-9.

**SECTION X**

**CLAIM PROVISIONS**

**PAYMENT OF CLAIMS**

Amounts payable under this Policy will be paid upon receipt and acceptance by US of all the required material. Required material shall include proof of loss and proof of Payment for Eligible Expenses under the Plan and any reasonably requested supporting documentation. WE will have sole authority to reimburse or deny claims under this Policy.

**BENEFIT DETERMINATION**

Determination of benefits under YOUR Plan is YOUR sole responsibility. WE have no duty to settle or adjust claims filed under the Plan with YOU or YOUR TPA. We have the right to review each claim YOU submit to US for reimbursement to determine if YOU are entitled to reimbursement. Only WE have the authority to reimburse losses covered by this Policy.

Stip. of the Parties, Ex. C, pp. 11-12.

Employee Coverage will automatically terminate immediately upon the earliest of the following dates, except as provided in any Extension of Benefits[3] provision:

. . .

2. The date the Employee ceases to be in a class of participants eligible for coverage.

Stip. of the Parties, Ex. A, p. 60.

### ELIGIBILITY

**Employee Eligibility:** Employees who belong to an Eligible Class of employees are eligible for coverage under This Plan following the waiting period.

**Eligible Class:** Full-time, Active Employees who work for The Company at least 40 hours per week on a regular basis. ... Temporary, seasonal, part-time, leased (even if determined to be common-law employees) and retired employees are not eligible for coverage.

Stip. of the Parties, Ex. A, p. 18.

### DEFINITIONS

**COMPANY**

Diversatek, Inc.

Stip. of the Parties, Ex. A, p. 79.

**EMPLOYEE**

An active employee of the Company receiving compensation from the Company for services rendered to the Company. Employee means a person who is in an employer-employee relationship with the Company and who is classified by the Company as a regular employee. . . .

Stip. of the Parties, Ex. A, p. 82.

---

[3] The Plan extends benefits under the following circumstances: when an employee is laid off, when an employee is on leave under the Family and Medical Leave Act, when an employee is on Military Leave, and when employment is terminated pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). *See* Stip. of the Parties, Ex. A, pp. 62-3.

**FULL-TIME WORK**
A basis whereby an Employee works for the Company for an average of at least forty (40) hours per week on a regular basis. . . .

Stip. of the Parties, Ex. A, p. 84.

**PLAN ADMINISTRATOR**
The Company, which is responsible for the management of the Plan, who will have the authority to control and manage the operation and administration of the Plan. The Plan Administrator...has the sole authority and discretion to interpret and construe the terms of the Plan and to determine any and all questions in relation to the administration, interpretation or operation of the Plan, including but not limited to, eligibility under the Plan, ..., and to determine payment of benefits or claims under the Plan and any and all other matters arising under the Plan.

Stip. of the Parties, Ex. A, p. 88.

**PLAN PARTICIPANT**
Any Employee or Dependent who is covered under this Plan.

*Id.*

## Coverage of White's Claims

The first matter for consideration is the Policy language, which the court finds to be clear and not reasonably susceptible to more than one interpretation. *Continental Corp.*, 892 F.2d at 544; *Wibracht*, 825 F.2d at 1199 (citations omitted). In accordance with Wisconsin law, courts are to apply clear terms in resolving insurance disputes. *Burgess*, 167 F.3d at 1140; *Continental Corp.*, 892 F.2d at 544; *Wibracht*, 825 F.2d at 1199 (citations omitted).

Next, the court turns to whether White was a covered plan participant when Diversatek sent claims to QBE. To make this determination, the court must look to the Policy and the Plan. Because Diversatek is asserting coverage, under Wisconsin law, it has the burden of proving that coverage exists under its excess loss policy.

-11-

According to the terms of the Policy, QBE agreed to reimburse Diversatek for paid plan benefits exceeding $35,000, up to $965,000, after Diversatek provided an acceptable proof of loss and satisfactory proof of paid plan benefits on behalf of a covered person. The Policy defines the term "plan benefits" as health benefits covered by the Plan during the policy period. Moreover, the Policy states that only Diversatek is responsible for determining benefits under the Plan. Therefore, according to the policy, whether White's medical expenses are plan benefits is Diversatek's "sole responsibility."[4] No term in the Policy gives QBE the right to determine whether White's claims were covered benefits under the Plan and to deny reimbursement on that basis.

The Policy incorporates Diversatek's Plan. The relevant section of the Policy reads: "This entire contract consists of: 1. this Policy, including any Endorsements; 2. YOUR Application and Schedule and any attachments thereto, a copy of which is attached to this Policy, and 3. a copy of YOUR Plan." ( Stip., Ex. C, p. 12.) The Plan states the administrator, Diversatek (or its third-party administrator), has "the sole authority and discretion to interpret and construe the terms of the Plan and to determine any and all questions in relation to the administration, interpretation or operation of the Plan, including but not limited to, eligibility under the Plan, ..., and to determine payment of benefits or claims under the Plan. . ." (Stip., Ex. A, p. 88.)

The Claims Provisions Section of the Policy provides QBE with the sole authority to reimburse losses covered by the Policy and the only limitation it places on loss reimbursement concern the need for Diversatek to submit appropriate documentation. The

---

[4] The Benefit Determination Section of the Policy states that "[d]etermination of benefits under YOUR Plan is YOUR sole responsibility."

Policy has two separate sections relating to this point: Section II states that "WE will reimburse YOU after YOU have provided an acceptable proof of loss and satisfactory proof of Paid Plan Benefits," and Section X states that "[a]mounts payable under this Policy will be paid upon receipt and acceptance by US of all the required material. . . ." Therefore, according to the terms of the Policy, QBE was liable to reimburse Diversatek as long as Diversatek submitted the required documentation for the plan benefits paid by Diversatek on behalf of one of its covered plan participants.

QBE does not argue in its motion for summary judgment that Diversatek failed to submit the required documents. Instead, QBE contends that it is entitled to summary judgment because White was not a covered plan participant when Diversatek paid his claims and as such Diversatek was not required to make the payment, for which it seeks reimbursement.

A reasonable entity would understand the Policy to prohibit QBE from denying reimbursement based on its determination that White was not a covered plan participant as QBE has no right under the Policy to make a benefit determination. Moreover, a reasonable entity would believe that the claims submitted to QBE for reimbursement were covered as long as Diversatek was complying with documentation requirements. Hence, the court finds that Diversatek has met its burden of proving that coverage for White's claims exists under the Policy.

The inquiry does not end here as the court has not addressed QBE's arguments. Because QBE relies on an exclusion to deny the claims, under Wisconsin law, it has the burden of proving that the exclusion applies. While it may be true that the Policy calls for all conflicts to be resolved in favor of the Policy, on this issue there is no conflict -

the Policy and the Plan give decision-making authority regarding the determination of benefits to the plan administrator, Diversatek. As stated above, the Policy fully incorporates the Plan. Moreover, the initial matter for determination by Diversatek was whether White was an eligible plan participant. Finally, QBE concedes that Diversatek has the sole responsibility to determine benefits under the Plan.

Although this is not an ERISA case, ERISA case law is helpful here. According to clearly established law, the abuse of discretion standard applies to benefit decisions (most often denial of claims) under ERISA plans which give plan administrators discretion to determine benefits. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) (reiterating the standard of review as the deferential abuse of discretion standard where the ERISA plan provides the administrator or fiduciary discretionary authority to determine eligibility for benefits citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)); *Ruiz v. Continental Cas. Co. et. al*, 400 F.3d 986, 989 (7th Cir. 2005) (holding that the arbitrary and capricious standard is the correct standard of review to use when a plan's language indicates discretionary authority has been given to the administrator). *See also Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010); *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2nd Cir. 2009). This deferential standard means that a court will not overturn an administrator's decision unless it is unreasonable. *Ruiz*, 400 F.3d at 991(stating that "we cannot overturn a decision to deny benefits unless the decision was 'downright unreasonable.'"); *Manning*, 604 F.3d at 1038 (stating that "[t]o determine whether a plan administrator's decision was arbitrary and capricious, the court examines whether the decision was 'reasonable.'") (citation omitted).

In a case similar to the case at bar, the district court in the Southern District of Iowa used the abuse of discretion standard to review a plan administrator's approval of a benefits claim. In *Computer Aided Design Sys. Inc. v. Safeco Life Ins. Co.*, the court held that Safeco breached its contractual obligation to CADSI by refusing to pay the excess loss claim because CADSI did not abuse its discretion as plan administrator when it approved its plan participant's claim for benefits. *Computer Aided Design Sys. Inc.*, 235 F.Supp.2d at 1062. In that case, the insurance policy term at issue read: "SAFECO 'will reimburse you for a percentage of the amount of covered expenses you have paid for covered persons under your plan.'" *Id.* at 1058. The policy also incorporated the Plan. *Id.* at 1060. The Plan stated that the administrator "shall have discretionary authority to determine whether and to what extent participants and beneficiaries are entitled to benefits, and to construe disputed or doubtful Plan terms," and "shall be deemed to have properly exercised such authority unless they have abused their discretion hereunder by acting arbitrarily and capriciously." *Id.* at 1060. The court held that because the policy incorporates the Plan and the Plan gave CADSI discretion to make benefits determinations, Safeco would be treated like a plan beneficiary and would bear the burden of proving that CADSI abused its discretion in approving the claim at issue. *Id.* at 1060-61. The court determined that the plan administrator's decision to approve the claim was reasonable, i.e. supported by substantial evidence, and therefore, Safeco's denial of the claim was a breach of its contractual obligation. *Id.* at 1061-62. The Eighth Circuit Court of Appeals affirmed the district court's decision. *Computer Aided Design Sys. Inc. v. Safeco Life Ins. Co.*, 358 F.3d 1011 (8th Cir. 2004).

Here, the Policy and the Plan give Diversatek sole discretion to make benefits determinations. As was the case in *Computer Aided Design Sys. Inc.,* the Policy incorporates the Plan. Moreover, in this matter, the plan administrator language also gives Diversatek sole discretion to make eligibility determinations. Further, QBE has not pointed to any provision of the Policy that gives it the right to overrule any of Diversatek's eligibility decisions. Therefore, with ERISA case law principles as guidance, the court comes to this conclusion - to rely on the Policy's exclusions, QBE must show that Diversatek abused its discretion in determining that White was a covered person under the Plan. In other words, QBE must establish that it was unreasonable for Diversatek to conclude that White was eligible for coverage under the Plan when his medical expenses arose.

QBE maintains that Diversatek should have terminated White's coverage when he was placed on leave because he was no longer in an eligible class, as he was not working forty hours per week on a regular basis. Moreover, QBE asserts that White was not an employee under the definition in the Plan because he was not receiving compensation for services rendered. For these reasons, QBE contends that it was unreasonable for Diversatek to determine that White remained covered under the Plan. On the other hand, Diversatek submits QBE's interpretation of the Plan would make insurance coverage of its employees illusory. It states that "[i]f the Plan in this case really did intend to cause coverage to terminate for employees who are unable to work due to injury or illness, it could, and presumably would, have plainly said so." ( Pl.'s Brief in Resp. to Def.'s Mot. for Summ. J. at 2.) The court agrees and notes, the Plan plainly states the opposite intention. The Eligibility Section reads:

> A group health plan may not base rules for eligibility for
> coverage upon an individual being "actively at work," if a health
> factor is present. If a plan participant is absent from work due
> to a health factor, for purposes of plan eligibility, the individual
> is to be considered actively at work.

Stip. of the Parties, Ex. A, p. 18.

Given this clear intention to not allow an employee's medical condition to affect his/her eligibility under the Plan, the court concludes that it was reasonable for Diversatek to determine that White remained an eligible, covered plan participant until his termination on March 30, 2007.[5]

As discussed above, under Wisconsin law, exclusionary language in an insurance policy is applied strictly against the insurer. *Burgess*, 167 F.3d at 1140. In doing so, the court has concluded that Diversatek's determination regarding White's eligibility under the Plan and subsequent coverage of his claims was reasonable. The Policy language established that White was a covered person under the requirements of the Plan, and that the insurer QBE has failed to demonstrate White was excluded from coverage prior to his termination on March 30, 2007.

### Interest

Diversatek asserts that it is entitled to 12% interest per year on $419,308.60 that it paid out-of-pocket relating to White's medical claims for QBE's failure to pay the claims within thirty days of receiving written notice of the loss from Diversatek citing Wis. Stat. § 628.46(1). Alternatively, Diversatek contends that it is entitled to 5% interest under Wis. Stat. § 138.04, because the amount owed by QBE is readily determinable. *U.S. Fire*

---

[5] As Plan Administrator, Diversatek, had the sole authority to make not only eligibility determinations, but also to determine payment of benefits or claims under the Plans, etc.

*Ins. Co., v. Good Humor Corp.*, 173 Wis. 2d 804, 833, 496 N.W.2d 730, 740-41 (Ct. App. 1993). QBE contends that because the validity of Diversatek's claims are debatable, especially in light of QBE's repeated requests for further information on White's continued benefits coverage, interest is not payable.

> Wis. Stat. § 628.46(1) states that
>
> [u]nless otherwise provided by law, an insurer shall promptly pay every insurance claim. A claim shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of the loss. ... Any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer.

Because there is no dispute that Diversatek notified QBE of the loss and the amount due, the critical issue in assessing whether Diversatek is entitled to interest under the statute is whether QBE had reasonable proof of non-responsibility. The Wisconsin Supreme Court stated that "'[r]easonable proof ' means that amount of information which is sufficient to allow a reasonable insurer to conclude that it may not be responsible for payment of a claim." *Kontowicz v. American Standard Ins. Co.,* 2006 WI 48, ¶ 48, 290 Wis.2d 302, ¶ 48, 714 N.W.2d 105, ¶ 48 (Wis. 2006) The Court clarified that "[o]ur case law has generally equated 'reasonable proof' of non-responsibility under § 628.46 with whether the 'coverage issue was fairly debatable.'" *Id.* (citing *Allstate Ins. Co. V. Konicki,* 186 Wis.2d 140, 160, 519 N.W.2d 723 (Ct. App. 1994).

In the case at bar, QBE lacked reasonable proof that it was not responsible for the payment of DIversatek's claims. The information it had was sufficient to allow a reasonable insurer to conclude only that it was responsible for the payment of the claims.

Specifically, the Policy stated that QBE would reimburse Diversatek for health benefits covered by the Plan after Diversatek provided QBE with acceptable proof of loss and proof of payment. The Policy provided that it was Diversatek's sole responsibility to make benefit determinations under the Plan and gave QBE sole authority to make reimbursement determinations. The Policy also incorporated the Plan which granted the plan administrator, Diversatek, the sole authority and discretion to determine all questions relating to eligibility. Finally, the Plan's eligibility provision stated that for purposes of eligibility determination, an employee's absence from work due to a health factor cannot make the employee ineligible for coverage. Thus, considering the information available to QBE and the discussion regarding coverage above, the only reasonable conclusion that QBE could have drawn was that it was responsible for the payment that Diversatek requested.

That QBE sought information regarding how Diversatek determined that White was eligible for benefits does not prove that the issue of coverage is debatable. Auxiant, Diversatek's third-party administrator, asked for work status information from Diversatek, but also submitted claims on behalf of Diversatek to SLG, QBE's program management company. Hence, this is no indication that Auxiant found anything to support the conclusion that White's medical expenses were not covered.

SLG's request for information regarding "the last date the Employee was actively working the required 40 hours per week per the Plan Doc., as well as how coverage has continued for this individual (sick/vacation time, FMLA, COBRA)..." demonstrates that it was cognizant of the eligibility section of the Plan. QBE's focus on policy language as a basis for its motion for summary judgment shows that it has read the

Plan. This is not surprising inasmuch as a reasonable insurer would, or should, read the eligibility provisions of a policy in deciding whether to pay claims. Here, QBE must have, or reasonably should have, read the "absence due to health factor" provision of the policy situated two paragraphs below the paragraph that forms the basis for asking Diversatek about White's work status. Consequently, the court is satisfied that the issue of coverage based on White's eligibility is not fairly debatable.

## Attorney's Fees

Diversatek maintains that QBE acted in bad faith when it denied coverage of its claims and that it is entitled to attorney's fees because QBE: 1) ignored the language of the Plan and the Policy, 2) usurped Divesatek's decision-making role, 3) ignored the plain purpose of the Policy, and 4) disregarded the continued receipt of premiums for White's coverage. Conversely, QBE maintains that it reasonably relied on the Policy and Plan terms when it denied Diversatek's claims. Furthermore, it repeats its contention that because the validity of Diversatek's claims are debatable, especially in light of repeated requests for supplemental information respecting White's status, Diversatek is not entitled to attorney's fees.

"To establish a claim for bad faith, the insured 'must show the absence of a reasonable basis for denying benefits of the policy and the [insurer's] knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.'" *Danner v. Auto-Owners Ins.,* 2001 WI 90, ¶ 61, 245 Wis.2d 49, ¶ 61, 629 N.W.2d 159, ¶ 61 (Wis. 2001); *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 691, 271 N.W.2d 368, 376 (Wis. 1978). "The insured must establish that, under the facts and circumstances, a reasonable insurer could not have denied or delayed payment of the claim. In other words, the trier of fact

measures the insurer's conduct against what a reasonable insurer would have done under the particular facts and circumstances." *DeChant v. Monarch Life Ins. Co.*, 200 Wis.2d 559, 578, 547 N.W.2d 592, 599 (Wis. 1996) (citation omitted). Insurers "may challenge claims which are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis." *Anderson*, 85 Wis.2d at 693. The Wisconsin Supreme Court has determined that attorneys' fees are recoverable as damages for claims of bad faith because "a plaintiff is allowed to recover for all detriment proximately resulting from the insurer's bad faith, which includes ... attorney's fees that were incurred to obtain the policy benefits that would not have been incurred but for the insurer's tortious conduct." *DeChant*, 200 Wis.2d at 572-73.

Because the standard for assessment of interest under Wis. Stat. § 628.46 is similar to the test for Wisconsin's tort of bad faith, the discussion here will be similar and for efficiency sake, will also be abbreviated. The court has already found that Diversatek has established that QBE lacked a reasonable basis for denying benefits under the Policy. Moreover, in the previous section, the court concluded that QBE is cognizant of the Eligibility Section of the Plan, including the provision pertaining to absence from work due to a health factor which it relied upon to deny benefits. This means that QBE knew or should have known that it did not have a reasonable basis for refusing to pay Diversatek's claims.[6]

---

[6] The Wisconsin Supreme Court has held that such knowledge can be inferred and imputed to an insurance company. *See Anderson*, 85 Wis.2d at 693. That is what the court has done in this case as the insurer should have read the entire section before rely on a portion of it to deny significant benefits to the insured. Reading the entire section would have shown QBE that its work status inquiries were irrelevant to the issue, that White continued to be covered under the Plan pursuant to the health factor provision and that it could not reasonably deny Diversatek's claims for coverage under the excess loss policy.

The Wisconsin Supreme Court has stated that an insurer's proper investigation, evaluation and review of the results of that investigation are relevant to a court's application of this test. *See Anderson*, 85 Wis.2d at 692-93; *Hejsak v. Great-West Life & Annuity Ins. Co.*, 331 F.Supp.2d 756, 766 (W.D. Wis. Aug. 17, 2004). It is clear that QBE did not properly investigate this issue, or willfully disregarded the provision concerning health related leave, because had it done so, it should have concluded, as the court has, that the health factor provision of the Eligibility Section controlled and required Diversatek to pay White's medical bills under the Plan as he was a covered plan participant. Hence, the record fails to support QBE's contention that the validity of Diversatek's claims is debatable and it will be held liable for bad faith denial of those claims.

### SLG's Joint Liability

QBE submits that because SLG is its agent and not a party to the Policy, it can have no liability on the Policy. On the other hand, Diversatek argues that SLG should be held jointly and severally liable for acting in bad faith because its conduct caused the claims to be denied.

Under Wisconsin law, the tort of bad faith "is a separate intentional wrong, which results from a breach of duty imposed as a consequence of the relationship established by contract." *Anderson*, 85 Wis.2d at 687. "This special duty of good faith and fair dealing runs throughout the contract relationship between the insurer and the insured. ... Breach of this duty may give rise to tort damages because an insurer has a special fiduciary relationship to its insured. *Danner*, 2001 WI 90, ¶ 49 (citing *DeChant v. Monarch Life Ins. Co.*, 200 Wis.2d 559, 570, 547 N.W.2d 592 (1996)) (internal quotation marks omitted).

In this case, the only parties to the contract at issue–the Policy–are Diversatek and QBE.  The Policy is clear on this point.  It reads: "YOU and WE are the only parties to this Policy."  (Stip., Ex. C, p. 15.)  Because under Wisconsin law, the tort of bad faith arises from a contractual duty and SLG is not a party to the contract and has no contractual duty to Diversatek, it is not liable to Diversatek for bad faith damages.

## Conclusion

In light of the foregoing discussion, Diversatek is entitled to coverage of its claims under the Policy plus 12% interest per year on the $419,308.60 that it paid out-of-pocket relating to White's medical claims pursuant to Wis. Stat. § 628.46(1).  No exclusions apply.  Additionally, QBE is liable to Diversatek for its bad faith denial of Diversatek's claims because it had no reasonable basis upon which to deny the claims.  However, SLG is not liable to Diversatek with regard to those claims.  Consequently,

IT IS ORDERED that the plaintiff's motion for summary judgment is granted in part and denied in part.

IT IS FURTHER ORDERED that the defendant's motion for summary judgment is granted in part and denied in part.

Dated at Milwaukee, Wisconsin, this 30th day of November, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U.S. DISTRICT JUDGE